Case 24-5998, Nicholas Brekelmans et al. v. Max Salas. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant when ready. Good morning. Good morning. My name is Philip McNutt. I'm here representing the Brekelmans and McLaughlins, who are the plaintiffs in the lower court and the appellants here. With me is my co-counsel, Taylor Cates, from Nashville, Tennessee. And I've reserved five minutes for rebuttal, Your Honor. You know, just, I don't mean to kind of pre-remit anything, but just at the outset, I'm just wondering, I think I understand why we could have jurisdiction here, but this is an interlocutory appeal, as I understand the record. There are six claims that you've made. Only two were the subject of a decision by the district court on summary judgment. And so why is it that this case is here now, unlike, you know, 99% of the cases, where there's plenty left to do in the lower court, and usually we don't get it then? Well, I think a couple of reasons, and we discussed this in the bankruptcy court as well. One of the reasons is that this case has been going on since 2018 in one form or another. Two different courts, two different appeals, including this one. And also, there's been a lot of discovery and a lot of preliminary matters. And I believe the bankruptcy court felt that this is an interlocutory decision that could matter. But the reason we wanted to take it up is because if our side wins this appeal, then it allows us to go back in the court and to prove the easiest of the cases whereby we'd be able to recover property for the benefit of the estate. So the decision here in no way mooted out your other four claims? It did not moot the other three claims. Essentially counts one and two. Count three is kind of a catch-all thing, but counts one and two would remain and would go to trial regardless of the decision here. But this would cut out the need for an additional appeal. Can I ask you a question about counts one and two then? Sure. Are you challenging, is anybody challenging the denial of summary judgment on counts one and two? Are those before us right now? We have not. We have challenged it to the extent that we believe the facts in the case are such that if they are decided based on the summary judgment criterion, we believe that we've proven enough that we're entitled to judgment on all accounts of the complaint, including count one. Can I ask you about count three? I don't think you sought summary judgment on count three, so that is not before us on appeal. Am I correct about that? That's correct, Your Honor, but counts one, two, and three are really the same type of facts and one, two, and three are based upon the same factual scenario and the same basic law. What about the actual fraud claim that's, I think, part of counts four and five? It seems to me you did not seek summary judgment on that claim either, so that's not before us. Yes, not on the actual fraud, on the constructive fraud only, Your Honor, yes. That's correct. And then as to count six, that's just sort of a recovery statute. It allows you to recover in the event that you obtain a judgment on counts one through five. It does have the feeling of being piecemeal litigation. Has our court granted the certificate formally or made a decision? I mean, the district court said, the district court accepted the interlocutory appeal, but we also have to accept it before we would adjudicate it. Have we done that yet? No. Okay. Do we have to accept or does the 1292 grant carry through to the appellate court? Well, I guess . . . That was our position. Your position is that once the district court grants the 1292, we have jurisdiction or we . . . We must. That's what we stated. That's where we stated the jurisdiction came from.  It's just very unusual, regardless of how long it's been going on in the lower courts, it's just very unusual for us to do this sort of thing piecemeal in summary judgment. That said, I don't want to derail your substantive argument, so please go ahead. Sure. Your Honor, the crux of the district court decision, which is on appeal here, is stated as follows. It is undisputed that Len Salas' name was on the deed of trust and mortgage documents solely because Max Salas was unable to obtain financing in his own name. And the only reason Len Salas' name was never removed from those documents was again because Max Salas could not obtain financing. That part, Your Honor, which is on page two of the decision is . . . The district court decision, that part is factually incorrect. There are several reasons we have established why Max Salas wanted his name. He did not want his name on the property. And two of them relate to tax avoidance and basically avoiding his creditors. And that's clear from the actions that Max Salas took or didn't take from 2007 through 2018, the date that his bankruptcy was filed, which started the ball rolling that got us to this court today. But now as a bankrupt debtor, he wants the property when before he didn't want it because of creditors, but now he wants it? Well, yeah, he wanted the property in his name and he was able to do that at the end of his own bankruptcy proceeding in the District of Columbia. But before that, he would not let Len off the deed and he would not let Len off the financing. He needed Len's credit. Does the record reflect the value of this homestead exemption? I know it's unlimited in D.C., but there's a pretty sizable mortgage lien, right, on the property? There's a mortgage lien that at the time that the lien was established, the last number that I knew, was about one-half of the equity in the house. So there was approximately, at that time in 2019, there was approximately a million-three in equity in the house. And my clients are not after the house. They want Max Salas. Max Salas took this house, burned it to the ground with my client's children in the house. It was established that he burned it to the ground? That he committed arson? Is that what you're saying? No, not committed arson. It was negligence. I believe it was criminal negligence, but it was found to be gross negligence. That's what the Superior Court found. He took the insurance proceeds and rebuilt the house and allowed the house to be used for rentals, which he was doing before, illegally, under D.C. law. And because there were no fire protection, these children of my clients were killed, tragically killed, in the fire in 2015. So did the judgment that you obtained against Max Salas, did that come after those insurance proceeds were available? Had he already dumped them into the property? Is that why you're here, basically? Correct, Your Honor. So this 2007 transfer is when Max's now ex-wife transferred the property to Max. Max transfers it to Lynn, correct? Yes. And then the fire occurred in 2015, so that's many years down the road. So does it make a difference that the record reflects that, I think, that Max was making efforts to get this property put back in its name for a number of years and just was not able to do so? Now maybe you take issue with how I characterize that, but there seem to have been efforts, 2007 and afterwards and then in 2010, to get this property back in Max's name. Mortgage was in, I know, in Lynn's name, but Max was making the payments. Or at least Lynn did not make any payments. As well as insurance and maintenance and things of that nature. Lynn did not make payments, neither did Max. He made no payments that are in the record. It could prove that no payments were made by him from the period from 2007 through 2018, except for one payment out of the insurance proceeds in 2017. The mortgage was in default several times during that period of time. And the mortgage went from $870,000 in 2007 to over $1 million as of 2018. Was the ex-wife, the mortgage ower, there? I mean, who was the recipient of the payments, or at least entitled to them? A SunTrust Bank. Okay. I mean, it's just, I guess, why do you think that the bankruptcy court was wrong in determining that this was a resulting trust under D.C. law? It seems to map onto the reality of this arrangement. A resulting trust requires intent. There was no intent. If you look at the transactions after 2007, Max, there was this so-called quit-claim deed in 2010. Well, that was abandoned in 2011. The emails that we discovered in 2020, 2021, I think, indicate quite clearly that the quit-claim deed, which Max relied on, was abandoned in 2011. Nobody knew where it was after 2011. But I think the reasoning was that the whole time this was a sham, that Max was the de facto owner the whole time, and that Len was just a stand-in for Max because Max, you know, had bad credit and couldn't get the mortgage with the lender. And so Len's there, but de facto, it's all for Max. In 2015, the year of the fire, Max filed a tax return that showed no ownership of the property, no receipt of rental payments, none. He testified and Len testified. Well, you know, he doesn't seem like a guy whose word is necessarily, you know, something that we would take and face back. And that's why we believe that the unclean hands doctrine applies to this and should have compelled the bankruptcy court and the district court to deny any relief to Mr. Salas. And if you go through the history of the transactions, But it would be unclean hands. Don't you have either they have this charade or whatever, but it's formally his property, but you have the unclean hands argument, right? Because he's trying to evade his creditors or whatever it is. And specifically taxes. He has a history of taxes. Right, but that would still mean that as a formalistic matter, the D.C. court is correct but doesn't deal with the unclean hands, which you can litigate. I don't think the court was correct, Your Honor, because the court found that there was a resulting trust based upon the quick claim deed in 2010, which we found out now was abandoned. And I contend that all of the statements and all of the testimony of Ron, the lawyer's son, Len, the son that's in bankruptcy and the debtor in our case, and Max all lied about it in several court hearings, including D.C. Okay, you'll have your rebuttal. Thank you, sir. Thank you, Your Honor. Good morning, may it please the court. Philip Young from the law firm of Thompson Burton in Nashville on behalf of Max Salas, the defendant and appellee in this matter. I want to begin by acknowledging that this is a tragic case. This has ruined a lot of lives. I guess he's making it more tragic by keeping them from getting a very valuable asset and to pay off the judgment for their terrible loss. I understand, Your Honor. But, you know, it's your right. Right. I acknowledge how tragic this is. As an attorney, it's my job to focus on the law. No, I get it. I get it. But I don't want the court to believe that I'm callous to this. I'm not callous to this. No, we're not, Attorney. Also, before jumping into my argument straight away, I want to encourage this court not to stray beyond the actual record. There's a lot of the appellant's brief that is full of commentary and musings that seem to be passed off as facts, but no record is cited. And it's not this job, as we cited in our brief, it's not the job of this court to go hunting for truffles. It's their job to cite to the record and for large portions of their argument. They've not done that. With that, I'll start my discussion with what the lower courts did not decide. Because the appellant seemed to be a bit confused about this, and as the court mentioned, there's a lot left to be done in this case. In fact, the majority. So, I mean, in your view, why are we here right now? Your Honor, I didn't think that the district court should have granted review, but they did. We looked at the issue. We were not confident that that did not carry through to this court. So that's why we did not challenge jurisdiction of this court. Yeah, put that in positive form. In other words, we found no evidence that this court could not hear it because the district court had reviewed it. Do we have to? I don't understand. Are we bound by the 1292? I don't even know how that works. But are we bound by the 1292 grant by the district court? We have to independently grant it again. Is that right? I think the court has to independently grant it again, but I think it's discretionary. Okay, but we haven't done that. Not to my knowledge. What would be a compelling reason if we have discretion to decide the matter now? Let the trial court handle this. Sure. I think if this were to resolve a large part of this case, then that would be certainly worthwhile for this court. That's not the case because what's left here is actual fraud. The court specifically reserved that. The court specifically reserved the issue of unclean hands. The court specifically reserved all of the 544A claims. Really, I think that's the meat of this case, frankly, are the 11 U.S.C. 544A claims. That's what the D.C. court specifically reserved in their holding. When they found that Max Salas was the owner, there's this footnote that essentially says, but the Tennessee courts might undo this under 11 U.S.C. 544A. Both the bankruptcy court and the district court found that they needed more facts in order to decide whether there was inquiry notice under the 544A actions. We actually had moved for summary judgment in our favor on the 544A because we felt like there was a lot of undisputed facts in the record that would establish that the world was on notice, inquiry notice, which is proper under D.C. law. The court said we need to weigh. We appealed that issue to the district court. The district court agreed, and we did not appeal that to this court. I should know the answer to this question, but I don't. Is there a way that the amount that's protected by the Homestead exemption can be clawed back at some point pursuant to one of these other claims? So if the plaintiffs can prove actual fraud or somehow prevail under the Council 1 or 2, the bankruptcy court has said that the Homestead exemption is valid. Is there any way that any of that can be clawed back, or is that sacrosanct and just protect it forever and the plaintiffs can never recover from it? I wished it were sacrosanct for my client's position, but it's not. And in fact, the D.C. court specifically, I think, acknowledged that under 544A, if the good faith purchaser, if the hypothetical lien creditor was not aware of the transfer, then it could invalidate the transfer to the trust. And so I think that issue still remains. And again, I really think that's the meat of the issue. Those three issues remain to be resolved. Actual fraud remains to be. There's a lot remaining here. The only thing, the only thing that the two lower courts decided was bare legal title. That is, constructive fraud. Both of the lower courts decided that because Lynn Sousa... In other words, that Max is the owner as a result, right? That's correct. This resulting trust? That's right. That at most, what Lynn Sousa owned was bare legal title, which under a long line of bankruptcy court opinions is not any asset of value to a bankruptcy estate. If it's not an asset of value, it can't be transferred for less than reasonably equivalent value. And so that's why the lower courts... That's exactly right. That's why the lower courts threw out those two counts because they found... And the bankruptcy court and the district court got there similar ways but slightly different, just so the court's aware. The bankruptcy got there under two ways, both as an independent finding that based on the undisputed facts that Lynn Sousa could own no more than bare legal title and also because of the preclusive effect of the D.C. bankruptcy court's order finding that Max Salas was the owner of the property. The district court didn't touch preclusion. So that takes care of part of counts four and five? Correct. That's correct. But the actual fraud part, nobody has ever moved on actual fraud. All the parties recognize that's fact. So all of the counts are still alive. So actual fraud just could trump everything.  Right. All the lower courts decided was constructive fraud. This is just...  Yeah. And that's why I wanted to point out what was not decided because there was a lot more that was not decided than what was decided. So every claim is still alive. Is that right? Yes, Your Honor. It's just that... That's what we do. Every claim is still alive. It goes back. That's correct. Only under D.C. law and under 511 U.S.C. 548, the constructive fraud portions of that count are eliminated. The actual fraud portions of that are still alive. What provision of the code does that determination come through? Is that 544A? The actual fraud? If there were a determination of actual fraud... 548. 548. Because 548 provides actual fraud or constructive fraud. There's two different sections. So there's no constructive? They've said that? The lower courts have said that there cannot be constructive fraud here. Because it's worthless. Correct. Because Lynn Salas... Their own legal title. Right. Under both the preclusive effects of the D.C. court order finding that Max Salas was the owner and under an independent analysis of the undisputed facts. That's why the district court... What would the actual fraud... I guess you're indulging us. What would the actual fraud determination... How would that go? Because we're not talking about bare legal title at that point, are we? That's correct. What we would be talking about at that point was whether the transfer was made with intent to defraud creditors. That's where that focus would be. And that would be defrauding the lender in that instance, I guess. Or I think the plaintiffs have argued the IRS. That the transfer could have been... But again, that's for another day. Just like unclean hands, it's for another day. Just like 11 U.S.C. 544A issues are for another day. The court has... Both lower courts have determined we need more facts. That's right. This is, from our perspective... I mean, these are really serious claims in bankruptcy court. Yes. Right. And again, I mean, we took a shot under 544A because a lot of the facts look like inquiry notice facts that other courts rely upon. We thought... That could stomp everything, maybe. That's right. If... Under 544A. It would not eliminate any proof of actual fraud, but I think as the court understands, and as Mr. McNutt has acknowledged here, that's a much higher standard.  And so that's a tougher hill to climb, actual fraud. 544A is actually the easiest route from point A to point B for the plaintiffs, but for the inquiry notice issue. And like I said, that's for another day. It's not for this court to decide today, but there are an awful lot of facts in the record that seem to match inquiry notice, what other courts look at for inquiry notice. And I think the bankruptcy court got close on that. The fact that, in other words, your client's paying for... Living there, renting it out, paying all the expenses, holding it out to be his property. Even the judgment that was filed in this case was against both. It was filed in the chain of title. They filed it before the bankruptcy in the chain of title. It was against both. And there are cases out there that say, hey, when there's a judgment order in the chain of title, you have a duty to go investigate why that judgment went down. It wouldn't take but about five minutes of investigation to realize that there was an argument about who the owner was of this property. You're talking about the 2015 judgment? That's right. That's right. But again, all of that is interesting. I get it. But it's not for today. What is for today is whether the district court and the bankruptcy court, and really they were following the D.C. bankruptcy court even, in finding... They made error in finding that Lins-Alice could own nothing more than bare legal title. Now, that's what's before the court. I think the record's clear. Sorry to interrupt. Just one second. My last question, hopefully. So for today, in terms of the resulting trust, is the argument that it arose by virtue of the 2007 transfer or the 2000, which was recorded, or the 2010 attempted trust deal that did not get recorded? It's the 2010 transfer, Your Honor. So you're not arguing that there was a resulting trust that arose from the 2007? No. It's the 2010 when Lins-Alice attempted to send it, to transfer it to a trust that was not properly formed. And that's why the D.C. court said, hey, this was attempted to transfer to a trust that was not properly formed. Therefore, under D.C. law, that is deemed to be a transfer to a resulting trust in favor of Mack Salas. So there's no argument that, I suppose from your perspective, that Lins-Alice only had, let's say, bare legal title by virtue of the 2007? I think we... If we were dealing with this in 2008 or 2009, it would be a closer call. I think we would still argue that there was bare legal title because, again, he never lived in the house. He never made any payments. In other words, if I could just... No, go ahead. So the import of the 2010 thing, which as a legal transaction is ineffective, I guess. That's correct. But it's just very probative of intent? That Max is de facto the owner of this thing? That's what the D.C. court found. I see. The D.C. court found that under D.C. law, that the failed transfer to the trust was nonetheless an intent to transfer it to Mack Salas, and so they found that Mack Salas was the owner because of a resulting trust. I want to... I'll end my time with these two quotes because I think this determines... This is very determinative of what we're hearing today. The Tennessee Bankruptcy Court found, even if collateral estoppel did not apply, the undisputed material facts support the same conclusion. That is that Lynn Salas owns nothing more than bare legal title. The Tennessee District Court agreed, finding that it's absolutely clear, based on the undisputed facts, that Lynn Salas never owned more than bare legal title to the property. Three courts... But all of that would go to the unclean hands, though, also? Your Honor, I think the unclean hands is so intertwined with the fraud, it's really the same issue... With the actual fraud. With the actual fraud, right. And so I think the court has just reserved all that, but I will speak to this. Unclean hands, at most, even if there had been a finding of unclean hands, it might prevent Mack Salas from defensively using equity. I mean, offensively. Offensively using equity. But unclean hands does not prevent you from defensively using equity, ever. Whose hands are we talking about? Right, right. Unclean? Is it Max's hands? Max's hands. That's what we're talking about. Unless the court has other questions, that's all I have. Thank you for your time. Thank you, Mr. Young. We'll hear from Mr. McNutt. Thank you. A couple of comments. Mr. Young talked about the lack of citations to the record, and the record includes all of the documents, all of which were produced by Len Salas and Mack Salas during the period of 2010 to 2018. There's not a single record that shows that Max made a single payment on the property. There's a claim that he made these payments, but his own testimony states that he used a trust called the CLR Trust. CLR stands for Chase, Len, and Ron, his three children. So that's the trust that he testified to and actually filed an affidavit, which states that he used the money from the trust receipts for the lease to pay for the property. But why isn't that him making the mortgage? You're saying that's not him making the mortgage payments? It's him. Did he control the trust? The leases that he says are the source of the money were all signed in the name of Mack Salas CLR or Mack Salas trustee. So he didn't control the trust? Who controlled the trust? The trust was, well, whether he controlled the trust, the beneficiaries of the trust were his sons, Chase, Len, and Ron. That's what he testified to. That's what Len testified to. Throughout this period... But who made the mortgage? Somebody paid the mortgage on this property, right? Yeah, and we don't know. You're saying it wasn't Max, it was the trust? It may have been Max doing it, but there's nothing in the record that shows that he did it. Nothing in the record. I mean, this is part of the reason cases don't come to us at this stage. We have a half-baked record on questions that seem germane to the issue in front of us. Your Honor, one other thing I want to state. The big difference, why we're here, is because there's a big difference between showing constructive fraud, which is what the court found on summary judgment in favor of Mr. Young's client, and actual fraud. Actual fraud, you have to prove intent. So we have to prove the intent of Mr. Salas. But you can show that by circumstances. We can, but constructive fraud... And there are a lot of circumstances here. I'm sorry. Oh, I'm sorry, sir. Go ahead. Constructive fraud is based on undisputed facts. It's undisputed that the property was transferred by law on the eve of the bankruptcy filing by Mr. Len Salas in 2018. So the transfer was within the statutory period prior to the bankruptcy filing, the day before the bankruptcy was filed. It's undisputed that Len Salas was insolvent at the time because he had relatively few assets, and among his obligations was a million-dollar claim of SunTrust, which he was still on. He was on the financing. He was on the mortgage. The record is clear, by the way, in addition that during the period 2010 through 2018, according to Kendra Salas in her deposition testimony and according to Len Salas, that more than once a year he would call his father, Len would call Max, and say, get me off of the loan. It's on my credit. It's hampering my credit. I can't buy anything. I can't own a house because you've left me on this and you won't get me off. That happened for a period of so many years, including 2015. Well, I mean, it seems like these various other courts concluded that Max had good reasons why he wanted Len to have bare legal title. I don't think it shows much more than that. Your Honor, if you look at the case law, the case law, bare legal title is a simple situation where all the indications of ownership lie in the person who granted the deed and then transferred it or took it back on the eve of bankruptcy filing. That's why it becomes an issue in a bankruptcy case because there was a transfer back at some point that makes it possibly a fraudulent conveyance or some other action that might be recoverable. That didn't happen in this case. It was never transferred back, and Max continued to hide it. So he didn't have open and notorious ownership. He had notorious, but not in the right way. He hid his ownership throughout. He made Len stay on this. This is not a person who is openly saying, I'm the owner of the property. That only happened after the bankruptcy filing. In fact, he opened up a bank account for the trust that he claims was created in 2010, and you know when he did that? He did that in October of 2017, right after he talked to Mr. Mark Albert, his bankruptcy attorney, and that's in the record. Okay, I think we're going to end it there. Thank you, Mr. McNutt. Thank you, Your Honor. Thank you, Mr. Young. The case will be submitted.